

**SIGNED this 13th day of December, 2017**

_____
Marcia Phillips Parsons
CHIEF UNITED STATES BANKRUPTCY JUDGE

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| In re<br><br>    BRETT W. HOUGHTON,<br><br>                                           Debtor. | No. 16-31934 MPP<br>Chapter 7 |
| KNOXVILLE TVA EMPLOYEES<br>CREDIT UNION,<br><br>    Plaintiff,<br><br>vs.<br><br>BRETT W. HOUGHTON,<br><br>    Defendant. | Adv. Pro. No. 16-3036 MPP |

# **M E M O R A N D U M**

Appearances:

    Kandi R. Yeager, Esq.      John P. Newton, Esq.      Dale J. Montpelier, Esq.
    Post Office Box 869        1111 Northshore Drive    120 Suburban Road
    Knoxville, TN 37919        Suite S-570                      Suite 203
    *Attorney for Plaintiff*        Knoxville, TN 37919      Knoxville, TN 37923
                                       *Attorney for Defendant*    *Attorney for Defendant*

**Marcia Phillips Parsons, Chief United States Bankruptcy Judge**. In this adversary proceeding, Knoxville TVA Employees Credit Union ("Credit Union") seeks a nondischargeable judgment against Brett W. Houghton ("Debtor") under 11 U.S.C. § 523(a)(2)(A) and (B) due to the Debtor's alleged fraud. The parties' dispute arises out of a loan that the Debtor obtained from the Credit Union for the ostensible purpose of financing the Debtor's purchase of a boat from the corporate dealership owned by him and his wife. Unfortunately, not only did the dealership not own the boat at the time of the loan, a fact the Debtor did not disclose to the Credit Union, but the Debtor also had no intention of personally purchasing the boat, even after his dealership subsequently acquired it.

Presently before the court is the Credit Union's motion for summary judgment, which is opposed by the Debtor. Because the undisputed facts of this case establish the elements of actual fraud under § 523(a)(2)(A) as discussed below, the motion will be granted as to this claim. The existence of disputed issues of material fact, however, preclude summary judgment as to the Credit Union's claim under § 523(a)(2)(B), which pertains to the false loan application allegedly executed by the Debtor. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

Prior to the Debtor's bankruptcy filing on June 24, 2016, the Debtor and his wife owned and were employed by Great Wakes Boating, Inc. ("Great Wakes"), a boat dealership involving the sales and service of new and used boats located in Lenoir City, Tennessee. The Debtor was the president and general manager of the business, his wife was secretary and general bookkeeper, and each owned 50% of the corporation's stock. Through its indirect lending program, the Credit Union provided financing to individuals purchasing boats from Great Lakes, with the Debtor as sales agent often completing the applications for the purchasers. Personally, the Debtor also obtained a number of loans from the Credit Union, a total of 12 different loans starting in 2009 and ending in 2014 with this one in question.

In late October or early November 2014, the Debtor telephoned the Credit Union at its Loudon County branch to request a personal loan and followed up the phone call by faxing to the

Credit Union a deal sheet on Great Wakes' letterhead dated November 7, 2014, signed by the Debtor. The deal sheet set forth that the Debtor on behalf of the dealership had quoted to the Debtor individually the price of $80,249 for the sale to him of a 2011 Malibu 247 LSV Wakesetter (the "Boat"). The deal sheet contained the identification numbers for the Boat's hull, engine, and trailer; referenced a boat to be traded in, valued at $47,500 but against which was owed $35,370.85; and, after adding in the taxes and fees, listed $82,177.38 as the final purchase price for the transaction.

The Debtor's proposed loan was handled at the Credit Union by Ben Saul, the branch manager and consumer lending officer. Mr. Saul had the computer generate a loan application based on the Debtor's financial information on record at the Credit Union; checked the Debtor's credit, which was excellent; and ascertained the status of the five loans to the Debtor that were outstanding at the time, none of which were delinquent. Because Mr. Saul only had loan approval of secured loans up to $50,000, the loan was also reviewed by two other loan officers. When the loan was approved, the Debtor was notified to go to the Credit Union to sign all of the paperwork. On November 7, 2014, the Debtor executed a promissory note and security agreement in the amount of $82,177.38, which along with interest of 5.99% was to be repaid by the Debtor in 144 monthly payments, and granted a security interest in the Boat being purchased by him under the terms of the deal sheet. The Credit Union alleges that the Debtor also signed at the same time the loan application generated by the Credit Union, a fact that the Debtor now disputes. The loan application indicated that the purpose of the loan was the purchase of a new watercraft and listed the Debtor's gross monthly income from Great Wakes as $16,400. This amount was incorrect, as it is undisputed that the Debtor's monthly salary from Great Wakes in 2014 was $6,500, with this amount reducing at some point later in the year to $1,200. Moreover, the Debtor's total income in 2014 from Great Wakes was $51,092.

Once the loan documents were signed, the Credit Union disbursed the $82,177.38 in loan proceeds in accordance with the documents. The Credit Union paid $46,806.53 on the Debtor's account, presumably to satisfy the outstanding loan the Debtor had obtained from the Credit Union on August 27, 2013, in the original amount of $49,900, to purchase from the dealership a 2012 Malibu boat that was being "traded in" for a credit of $47,500 against the $82,177.38 purchase

3

price of the Boat. The Credit Union disbursed $126.56 for the UCC-1 filing fee and paid the remaining balance of $35,244.29 to Great Wakes for the purchase of the Boat.

At the time of the Debtor's loan from the Credit Union, Great Wakes did not yet own the Boat. It was, however, in the dealership's possession as it held a mechanics lien for work performed on the Boat after it had been brought in for service by its owner. The Boat owner had filed his own individual chapter 7 case, and Great Wakes had reached an agreement with the bankruptcy trustee to purchase the Boat for $30,000. The bankruptcy court had entered an order approving the sale on October 23, 2014, but Great Wakes did not actually pay for the boat and receive a bill of sale until February 10, 2015.

The Debtor never purchased the Boat from Great Wakes. Great Wakes subsequently experienced financial difficulties, and the Boat was repossessed and sold on August 16, 2016, by Citizens National Bank, one of Great Wakes' inventory floor-plan lenders. The Debtor defaulted in payment to the Credit Union and ultimately filed for bankruptcy relief. According to the Credit Union's proof of claim, it was owed on the Boat loan a balance of $75,180.68 in principal, interest, and attorney fees as of the Debtor's June 24, 2016 bankruptcy filing. The Credit Union seeks judgment against the Debtor in that amount plus post-petition interest at the contract rate of 5.99%, attorney fees, and costs, and requests that the court determine that the debt is nondischargeable under § 523(a)(2)(A) and (B).

> Section § 523(a) of the Bankruptcy Code provides in pertinent part:
>
> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> . . .
>   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
>     (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or insider's financial condition; [or]
>     (B) use of a statement in writing—
>       (i) that is materially false;
>       (ii) respecting the debtor's or an insider's financial condition;

4

> (iii) on which the creditor to whom the debtor is liable for such money, property, or services, or credit reasonably relied; and
> (iv) that the debtor caused to be made or published with the intent to deceive[.]

11 U.S.C. § 523(a)(2)(A) and (B). The two subparagraphs, (A) and (B), are mutually exclusive. *See First Nat'l Bank v. Pontow*, 111 F.3d 604, 608 (8th Cir. 1997); *Haney v. Copeland* (*In re Copeland*), 291 B.R. 740, 759 (Bankr. E.D. Tenn. 2003). While the former excepts from discharge those debts procured by false representations, false pretenses, or actual fraud, the latter excepts those that are fraudulently obtained by the use of a false written statement of a debtor's financial condition. The Credit Union has moved for summary judgment under both subparagraphs (A) and (B). As the party seeking a determination of nondischargeability, the Credit Union bears the burden of proving the necessary elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991). The court construes nondischargeability claims strictly against the creditor and liberally in favor of the debtor. *See Rembert v. AT&T Universal Card Servs.* (*In re Rembert*), 141 F.3d 277, 281 (6th Cir. 1998).

The Credit Union's motion for summary judgment and statement of undisputed material facts are supported by the pleadings, the Debtor's responses to discovery, the Debtor's testimony from both his 11 U.S.C. § 341 meeting of creditors on August 2, 2016, and his deposition on April 27, 2017, and the affidavit of Mr. Saul. To support his opposition to the motion, the Debtor relies upon his response disputing some of the Credit Union's statement of facts and his own statement of additional undisputed material facts that is in turn supported by his affidavit, the Credit Union's responses to discovery, and the April 27, 2017 deposition testimony of Mr. Saul.

II.

The Credit Union's first basis for nondischargeability is § 523(a)(2)(A). The Sixth Circuit Court of Appeals has held that in order for a debt to be nondischargeable under this provision the creditor must prove four elements: (1) the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as

5

to its truth; (2) the debtor intended to deceive the creditor; (3) the creditor justifiably relied on the false representation; and (4) its reliance was the proximate cause of the loss. *In re Rembert*, 141 F.3d at 280–81.

Regarding the first element, there is no dispute that the Debtor obtained money in the form of a loan from the Credit Union. As the Debtor proposed in the deal sheet, the greater portion of the loan proceeds was applied to pay off the Debtor's loan on the boat he proposed to trade in. The remaining balance, except for a small amount to pay the UCC-1 filing fees to perfect the Credit Union's new security interest, was paid to Great Wakes to fund the Debtor's purchase of the Boat. Thus, the Debtor undeniably benefited from the loan, even though the loan proceeds did not pass through the Debtor's hands. For purposes of § 523(a)(2), it is unnecessary that the debtor directly receive the money from the creditor, only that the debtor benefit in some way from the property obtained through his deception. *See In re Copeland*, 291 B.R. at 760-761.

As to whether the Debtor procured the loan by knowingly false or grossly reckless material misrepresentations, the remaining component of the first *Rembert* element, the Credit Union asserts that the Debtor, either implicitly or expressly, falsely represented in the deal sheet, the promissory note, and the loan application that the dealership Great Wakes owned the Boat, that he would be purchasing the Boat from Great Wakes with the loan proceeds, and that he was granting the Credit Union a security interest in the Boat to secure the loan. As noted previously, the Debtor denies that he signed the loan application. But even without consideration of this document, the deal sheet and promissory note contain these clear and unambiguous representations by the Debtor. The Debtor does not deny that he signed and faxed the deal sheet to the Credit Union for the purpose of obtaining a personal loan to purchase the Boat from Great Wakes. Nor does he deny signing the promissory note that lists the Boat as security and recites, "You are giving a security interest in . . . [t]he goods or property being purchased." The Debtor admitted in response to the Credit Union's request for admissions that he did not advise anyone at the Credit Union that the dealership did not own the Boat, even though the Debtor implicitly represented in the deal sheet that he dealership owned and would be selling the Boat. Consequently, there is no genuine dispute that the Debtor made the representations in question.

6

Regarding their falsity and the Debtor's knowledge of them, it is undisputed that although Great Wakes had an agreement to purchase the Boat, which had been approved by the court, it had not yet done so at the time of the Debtor's representations to the Credit Union, a circumstance well known by the Debtor since he was negotiating the purchase with the trustee on behalf of the dealership. As to the Debtor's representation that he would be purchasing the Boat from the dealership, the Debtor does not deny that he never intended to purchase the Boat. Instead, the Debtor's defense appears to be that the Credit Union either knew that he was not going to purchase the Boat or otherwise acquiesced in the misrepresentation based on two prior loan transactions. The Debtor states in his affidavit, "I would sometimes take loans in my personal name to help my business. [The Credit Union] knew I did that because I told it several times." The Debtor's proffered examples of this practice are two loans the Credit Union made to him, one financing the Debtor's $14,000 purchase of a 2014 Kubota tractor from Tyler Brothers Farm Equipment on June 13, 2014, and the other financing the Debtor's purportedly $49,900 purchase of the 2012 Malibu boat from Great Wakes on August 27, 2013. The Debtor states that Mr. Saul advised him that he would receive a lower interest rate if the loan to purchase the Kubota tractor was made to him individually rather than to the dealership, even though the dealership would be using the tractor. The Credit Union denied that Mr. Saul gave this advice, which denial is supported by Mr. Saul's statement that he was not the loan officer on the Kubota tractor loan and had no contact with the Debtor relating to that loan. With respect to the 2012 Malibu loan, the Debtor states that he "specifically told [the Credit Union] that the boat would be held by Great Wakes, that it would be used as a demo boat, and that it would be sold," and the Credit Union "never complained or told me I could not do it."

Assuming the Debtor's statements are true, they do not contradict the undisputed evidence that the Debtor falsely and knowingly represented to the Credit Union that he would be purchasing the Boat from the dealership and that the loan was being made to finance this purchase. Even if the Credit Union knew that the Debtor sometimes obtained personal loans so that he could then make a "shareholder loan," as he called it, to the dealership, that knowledge in no way establishes that the Credit Union knew that the Debtor never planned to purchase the Boat from the dealership, such that the Credit Union in effect was making an unsecured loan instead of one secured by the

7

Boat. Nor does the claim that Mr. Saul advised the Debtor to take out the Kubota tractor loan in his name, rather than in the name of the dealership, create an issue of fact. Presumably, nothing would have prevented the Debtor, as owner of the tractor, from allowing the dealership to use his tractor and such use is not inconsistent with a purchase by the Debtor individually or with a grant of a security interest to the Credit Union to secure the purchase. Most importantly, there was no allegation by the Debtor that the Credit Union directed him to lie or misrepresent the purposes for that loan or any loan. Similarly, the fact that the Debtor may have previously told the Credit Union in connection with the 2012 Malibu boat loan that the boat would be held and used by Great Wakes as a demo boat is not inconsistent with a loan to the Debtor for the purchase of that boat. The Debtor does not claim that he told the Credit Union in connection with the loan that he would not actually own the boat, and as with the Kubota tractor, the Debtor as owner was presumably free to allow the dealership to hold and use the boat, even though it was security for a personal loan to him.

Stated succinctly, the Debtor has not raised any issue of fact concerning his knowing and false representations as to his proposed purchase of the Boat. Certainly, the Debtor's representations that he was buying the Boat from his dealership and giving the Credit Union a security interest in the Boat were "material" since the purpose of the loan was to finance this purchase, with the Boat to be collateral for the loan. *See In re Copeland*, 291 B.R. at 761 (citing 4 Collier on Bankruptcy ¶ 523.08[1][d] (15th ed. rev. 2002) ("A material fact is one touching upon the essence of the transaction.")). In conclusion on this point, the undisputed facts establish the first element of the *Rembert* test, that the Debtor obtained money through material misrepresentations that, at the time, the Debtor knew were false.

The second element of the *Rembert* test for nondischargeability under § 523(a)(2)(A) is that the debtor made the misrepresentations with the intent to deceive. *See In re Rembert,* 141 F.3d at 281 (citing *Field v. Mans,* 516 U.S. 59, 70-72, 116 S. Ct. 437, 444 (1995)). This intent to deceive a creditor is found "when the debtor makes a false representation which the debtor knows or should have known would induce another to advance goods or services to the debtor." *In re Copeland*, 291 B.R. at 765 (citing *Bernard Lumber Co. v. Patrick* (*In re Patrick*)*,* 265 B.R. 913, 916 (Bankr. N.D. Ohio 2001)). All that is required to establish an "intent to deceive" is "a

8

showing of an intent to induce the creditor to rely and act on the misrepresentations in question." *Merchants Nat'l Bank v. Moen* (*In re Moen*), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999). "Whether a debtor possessed an intent to defraud a creditor within the scope of § 523(a)(2)(A) is measured by a subjective standard." *In re Rembert*, 141 F.3d at 281. Courts may infer a debtor's fraudulent intent from the totality of the circumstances. *See In re Copeland*, 291 B.R. at 765.

> The court must consider whether the totality of the circumstances "presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor." The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations.

*Id.* (*quoting Wolf v. McGuire* (*In re McGuire*), 284 B.R. 481, 492 (Bankr. D. Colo. 2002); *Groetken v. Davis* (*In re Davis*), 246 B.R. 646, 652 (B.A.P. 10th Cir. 2000)).

The Debtor's answers to questions by the Credit Union's attorney during the meeting of creditors evidence that the Debtor's purpose for obtaining the loan was not to buy the Boat, but to obtain funds to keep the dealership going:

> Q. Yes. I'm here for First Peoples Bank and Knoxville TVA Employees Credit Union. Mr. Houghton, you made a loan at Knoxville TVA Employees Credit Union on November 17, 2014 and pledged a Malibu Wakesetter Boat. Did you own the boat?
>
> A. Um, yes.
>
> Q. You owned the boat at the time the loan was made?
>
> A. Yes. Well, no not really. Great Wakes owned it.
>
> Q. Had you ever owned the boat individually?
>
> A. No.
>
> Q. So why did you pledge a security interest in a boat that you did not own?
>
> A. Uh, the money went into the corporation.
>
> Q. That didn't answer my question. Why did you personally grant a security interest in a boat that you did not own?
>
> A. I don't know. Trying to keep the company afloat.

9

Q. Did you tell anyone at the credit union that you did not personally own the boat?

A. No.

Q. What happened to the boat?

A. One of the floorplans picked it up.

The Debtor's deposition testimony evidences that it had been his practice to obtain personal loans from the Credit Union for the purported purchases of boats from the dealership that he never actually purchased.

Q. Right. What happened to the boat that was traded in?

A. It got sold eventually.

Q. So it was transferred to Great Wakes as a trade-in?

A. It stayed in - - it never got transferred - - it was never transferred into my name. None of the boats ever got transferred into my name. They stayed on the lot as Great Wakes. I had a dealer tag I used to use the boat on the water.

Q. So the boat that you traded in wasn't in your name either?

A. Huh-uh (negative).

Q. I'm sorry?

A. No. They never have been.

Q. But you had a loan on it as well with KTVA?

A. True.

Q. In your name?

A. Yes.

Q. And granted a security interest in it?

A. Yes.

Q. And then traded it in on this boat?

10

> A. Yes.
>
> . . . .
>
> Q. And funds were distributed to KTVA to pay off another one in your name?
>
> A. Yes.
>
> Q. And that was another boat that you held, another boat with the credit union?
>
> A. Yes.
>
> Q. Is that yes?
>
> A. Yes.
>
> Q. And your testimony here today is you never owned that boat either?
>
> A. Not, not - - I guess, to the extent I was the president of Great Wakes, so I figured I did.
>
> . . . .
>
> Q. Did you understand that you were supposed to own the collateral when you were giving a security interest in it?
>
> A. I figured I did.
>
> Q. And you don't contest that you granted KTVA a security interest in the boat?
>
> A. No, I don't.

Although it is uncertain how many boats other than these two the Debtor granted security interests in that he never owned, responses to interrogatories by the Credit Union that the Debtor submitted indicate that the Debtor had also obtained three other personal loans from the Credit Union that were to be secured by Malibu boats purchased personally by him.

As evidence of his lack of an intent to deceive, the Debtor claims that he believed that he and the dealership were "one and the same," citing his lack of a college education and legal training. Further, the Debtor states that the Credit Union "never had an issue with the relationship between me and Great Wakes" as shown by "Mr. Saul's advice on the Kubota tractor." However, any belief by the Debtor that he and the dealership were "the same" must be considered in the context that he used a Great Wakes' deal sheet to falsely represent that he was individually

11

purchasing the Boat from the dealership, even going so far as to list almost $2,500 in Tennessee and local sales taxes that would be paid by the Debtor to the dealership and financed by the Credit Union as a part of the $82,177.38 purchase and loan. The Debtor's only refutation of these facts is that the Credit Union knew that he was getting personal loans for the benefit of his company and had even suggested the practice. The Debtor does not venture to explain that if the Credit Union knew the true nature of his plan and intent, why it was necessary for him to go through the charade of tendering a deal sheet that showed the terms of a purchase by him. There is no claim that the Credit Union told him to create a false document, either on this occasion or in the past, or that the Credit Union knew the Debtor did not plan to purchase the Boat, despite his obtaining a loan to do so. Even if the Debtor's portrayal of his transactions is designed to suggest this knowledge on the part of the Credit Union, no reasonable inference can be drawn in the Debtor's favor because no reasonable lender would make a loan, intended to be secured by the purchased collateral, without having the owner of the collateral grant the security interest. Because there is no plausible honest explanation for the Debtor's tender of the deal sheet other than the intent to deceive the Credit Union into making a personal loan to him, the court concludes that there is no genuine dispute as to the Debtor's intent to mislead the Credit Union in order to procure the Boat loan.

The third element of the *Rembert* test for nondischargeability under § 523(a)(2)(A) is that the creditor actually and justifiably relied on the debtor's misrepresentations, based upon the facts and circumstances existing at the time. *See McDonald v. Morgan* (*In re Morgan*), 415 B.R. 644, 649 (Bankr. E.D. Tenn. 2009). "Under this standard, a creditor will be found to have justifiably relied on a representation even though 'he might have ascertained the falsity of the representation had he made an investigation.'" *In re Copeland*, 291 B.R. at 767 (quoting *Commercial Bank & Trust Co. v. McCoy* (*In re McCoy*), 269 B.R. 193, 198 (Bankr. W.D. Tenn. 2001)). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases." *Sheen Falls Strategies, LLC v. Keane* (*In re Keane*), 560 B.R. 475, 490 (Bankr. N.D. Ohio 2016) (discussing red flags) (citing *Field v. Mans*, 516 U.S. at 70). "For example, the relationship between the debtor and the creditor factors into justified reliance. A debtor can take advantage of

12

his friendship with a creditor and misuse the trust associated with their relationship." *Id.* (citing *Heide v. Juve* (*In re Juve*), 761 F.3d 847, 853 (8th Cir. 2014)).

In this case, Mr. Saul, the loan officer for the Credit Union for this transaction, states that he and the other two officers justifiably relied on the Debtor's statements regarding ownership and intent in approving the loan in question. The Credit Union notes that there were no red flags that would indicate that it should check further into the Debtor's allegation of ownership and intention. Specifically, it cites the fact that this was the Debtor's twelfth loan from the Credit Union, there were no delinquencies in the Debtor's loans still outstanding, the Debtor had an excellent credit rating, and his dealership was active in the Credit Union's indirect lending program. The Debtor's only response to these undisputed facts is to question how the Credit Union's reliance can be justified "when it, itself, recommended the contrary in the past?" However, as noted earlier, there is no evidence that the Credit Union ever suggested that the Debtor falsely represent an intent to personally purchase a boat from his dealership or that he submit a deal sheet falsely setting forth such an intent. Further, the Debtor's representation that he intended to purchase the Boat from Great Wakes is not the kind that can be verified pre-loan as it was a promise that the Debtor would have to fulfill afterward. Thus, the undisputed facts presented by the Credit Union establish actual and justifiable reliance, and the Debtor has presented no evidence that would create a genuine dispute on this issue.

The fourth and final *Rembert* element to be considered by the court is whether the creditor's reliance on the misrepresentation was the proximate cause of the creditor's loss. Such a determination "depends 'on whether the debtor's conduct has been so significant and important a cause that the debtor should be legally responsible.'" *In re Copeland,* 291 B.R. at 767 (quoting *Britton v. Price* (*In re Britton*), 950 F.2d 602, 604 (9th Cir. 1991)). In other words, there must be "a direct link between the alleged fraud and the creation of the debt[,]" *Id.* (citing *McCrory v. Spigel* (*In re Spigel*)*,* 260 F.3d 27, 32 n. 7 (1st Cir. 2001)). Mr. Saul's affidavit and deposition testimony establish this link. Per the Credit Union's commercial lending practices, the loan would not have been made had the Debtor disclosed that Great Wakes did yet own the Boat, and that rather than a purchase by the Debtor, the Boat was to be owned and held by Great Wakes as inventory, with the Debtor to use the loan proceeds to make a loan to Great Wakes. The Debtor

13

claims that Mr. Saul would have approved the loan even if he had known Great Wakes would retain ownership of the Boat, but this is only the Debtor's opinion, not a statement of fact. Moreover, the Debtor's opinion is not credible, as an experienced lender would know that in order for the loan to be secured, the owner of the collateral would have to grant the security interest.

The Debtor also argues that the Credit Union's reliance on the Debtor's misrepresentations was not the primary cause of the loss, which he asserts was attributable to the Credit Union's UCC-1 financing statement that apparently left off one digit of the Boat hull's identification number, as well as the Credit Union's failure to have the Debtor sign a power of attorney so that the Credit Union could correct the error. However, the Credit Union's security interest in the Boat failed, not because it was not perfected correctly, but because it never had rights in the collateral due to the Debtor's failure to purchase the Boat. A debtor must have "rights in the collateral or the power to transfer rights in the collateral to a secured party" in order for a security interest to be enforceable. *See In re U.S. Ins. Group, LLC*, 429 B.R. 903, 912 (E.D. Tenn. 2010) (quoting Tenn. Code Ann. § 47-9-203(b)(2)). Because the Debtor did not purchase the Boat as he falsely represented to the Credit Union that he would, the Debtor never obtained any rights in the Boat, and, thus, the security interest never became enforceable, and could not attach to the Boat. *See* Tenn. Code Ann. § 47-9-203(a) ("A security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral . . . ."). As a result, the Credit Union's loan to the Debtor was not secured as the Debtor had bargained it would be. Consequently, the Debtor's arguments regarding alleged issues with the perfection of the Credit Union's security interest are irrelevant and have no bearing on the Credit Union's loss. The Credit Union, having established that the proximate cause of its loss resulted from reliance upon the Debtor's misrepresentations, has satisfied the fourth *Rembert* element.

III.

The Credit Union's second basis for nondischargeability, § 523(a)(2)(B), provides that debt incurred through the "use of a statement in writing: (i) that is materially false; (ii) respecting the debtor's . . . financial condition; (iii) on which the creditor to whom the debtor is liable . . . reasonably relied; and (iv) that the debtor caused to be made or published with the intent to

14

deceive" is nondischargeable. 11 U.S.C. § 523(a)(2)(B). "The measuring stick of material falsity is whether the creditor would have made the loan if the debtor's true financial condition had been known." *In re Copeland*, 291 B.R. at 782 (quoting *First Nat'l Bank v. Sansom*, 224 B.R. 49, 54 (Bankr. M.D. Tenn. 1998)).

In this proceeding, the loan application listing the Debtor's monthly income as $16,400 is the statement in writing that the Credit Union asserts as the trigger for § 523(a)(2)(B) nondischargeability. As previously noted, there is no dispute that this information was vastly incorrect. The Debtor first claimed that he did not prepare or review the application. Apparently recognizing that neither of these defenses would preclude a court from holding a debtor to a false statement contained in a loan application, the Debtor states in his affidavit, "I am now therefore disputing that I signed the loan application." According to the Credit Union, the loan application was signed electronically by the Debtor such that there is no hard copy evidencing the Debtor's signature. In light of the conflicting sworn statements as to whether the Debtor actually signed the application, summary judgment on the Credit Union's § 523(a)(2)(B) claim is not appropriate.

IV.

Rule 56 of the Federal Rules of Civil Procedure, as incorporated by Fed. R. Bankr. P. 7056, mandates the entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S. Ct. 2505, 2510 (1986)). In considering the motion, the court must construe all reasonable inferences in favor of the nonmoving party. *Spradlin v. Jarvis (In re Tri–City Turf Club, Inc.),* 323 F.3d 439, 442 (6th Cir. 2003). The party opposing the motion "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial. The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* at 442-43 (citations omitted); *see also*, *Nye v. CSX Transp., Inc.*, 437 F.3d

15

556, 563 (6th Cir. 2006) (stating that a "mere scintilla of evidence in support of the nonmoving party will not be sufficient").  "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate."  The court having considered the Credit Union's motion and the Debtor's response in this manner, summary judgment in favor of the Credit Union will be granted on its § 523(a)(2)(A) claim and denied on its § 523(a)(2)(B) claim.  An order will be entered in accordance herewith.

# # #